BYRD *v.* THE STATE.

No. 12512. NOVEMBER 22, 1938. REHEARING DENIED DECEMBER 3, 1938.

*Reuben A. Garland, George T. Manley, E. M. Smith,* and *E. L. Reagan,* for plaintiff in error.

*M. J. Yeomans, attorney-general, Frank B. Willingham, solicitor-general, Ellis G. Arnall,* and *E. J. Clower,* contra.

BELL, Justice. Ralph Byrd was convicted of the offense of rape, and recommended to the mercy of the court. His motion for new trial was overruled, and he excepted. It appearing that the female had attained the age of eighteen years, the prosecution was based upon the theory of actual want of consent, and did not involve the act of July 31, 1918, fixing the age of consent at fourteen years. Code, §§ 26-1301, 26-1302, 26-1303; Ga. L. 1918, p. 259.

The testimony of the female, who may hereafter be referred to as the prosecutrix, was substantially as follows: She was 18 years of age and resided with her parents in Atlanta. On March 23, 1938, she was employed by a baking company, and was working

on a night shift, the hours of which were from eleven at night until seven in the morning. She had been so employed for about four months. On the night in question she went to her work as usual, but on arrival was told by the superintendent that she would not have to work that night, but would come back the next night. It seems that some machinery was out of order. She left the place for the purpose of returning home by street car. On her way to catch the street car, she stopped at a lunch-stand where a young man whom she had known for about three months was employed. This young man "had been very friendly and very nice" to her. On this occasion he introduced to her the defendant, Ralph Byrd, saying: "This boy here will take you home. You will be all right; he is a friend of mine. I know him." Ralph stated that he would "be glad to," and he and the prosecutrix then entered an automobile which was standing nearby. After traveling for some distance in the direction of the home of the prosecutrix, which was about four miles away, he turned in another direction and "kept on driving," although she asked him many times to carry her home. On the Jonesboro road, he stopped at a filling station operated by a man that he said was, and who proved to be, a deputy sheriff. "He asked the sheriff what kind of boy he was and the sheriff said he had been knowing him a long time and he would treat me all right. Ralph got out of the car and started inside and the sheriff started in, too, and I called the sheriff back and told him that I was worried and that I had asked Ralph to take me home and asked him what did he think about it and he told me he had been knowing him for a long time and not to be worried. I told him I was worried because I got in the car with him and a very dear friend of mine told me it would be all right, and the sheriff said, 'Well, I will tell you what I will do. I will go in and talk to Ralph, myself,' and he went inside and came back. While this sheriff went inside I asked this colored boy where the ladies' rest room was—I will tell you that in case they bring it up—and he told me it was away up on the hill, so I went way up there in the dark and came back before this sheriff got back, and then the sheriff came and told me everything was going to be all right. He said, 'I have talked to Ralph and he is going to take you home,' and when Ralph came out I thought everything was going to be all right, depending on the sheriff. That is the only time I could have

gotten away from him. . . When we started away from the filling station I said, 'Aren't you going to take me home?' and he said, 'I do my business at night,' and I said, 'What kind of business do you do?' and he just laughed. He said, 'I have got to go to see my mother' and I said, 'Where in the world does she live?' and he said, 'Down the road a bit,' and I pleaded and begged and cried to get him to take me home and he would not listen. He said, 'I am going to see my mother and I will take you home then.' He then headed toward Jonesboro and went on through Jonesboro and we would keep on riding and I asked him how much further he had to go and he said it was just a little further and I was worried to death and he absolutely refused to take me home."

The witness further testified that the defendant turned to the left at Hampton, and after traveling several miles stopped in what appeared to be a lonely section, otherwise shown to be in Henry County, and accomplished the act of sexual intercourse with her under the following circumstances: "He stopped the car and I didn't understand what was going to happen and he put his head on the steering wheel and began to look at me, and he said 'You just as well make up your mind' and I said, 'What do you mean?' and then he began to talk and tell me that a girl like me had been out before, that I couldn't kid him, that he was nobody's fool, a girl that was built up and as pretty as I was had been around and I wasn't going to get away with it, and I began to plead and beg and try to tell him I had never been out with anybody before and he would not listen to me. Then he began to talk dirty, the language he used was terrible. Then he surprised me and he turned on me all of a sudden and he still had me believing he was going to see his mother and then take me home. I didn't have any idea that he was going to turn on me suddenly. He said, 'There is no need for you to try to run because there is a house about a mile up that way and one about two miles back that way and if you get out and start running I will catch you and there is no need for you to scream because no one can hear you.' He said, 'I have something in this car that can fix you right up,' and I asked him what he meant and he said he had some tape and he would gag my mouth if I didn't do what he said do and then leave me on the road to die and told me I would die because I couldn't breathe. He said, 'Which had you rather do, just give up or for me to tape your

mouth and leave you on the road?' I said, 'I had rather do that,' and he said, okeh, and then I got to thinking that my mother had warned me two or three days before . . Well, he grabbed my wrist and I managed to open the door and get out and he drug me up against the fender and I fell down the bank and he grabbed my wrist and twisted it terribly. I got down on my knees and everything else and he would not listen to me. I had my bag in my hand and dropped it and I felt like if I could pick up my pocketbook that he would turn me loose, but he didn't, he stooped down with me—he would not turn me loose. I struck at him two or three times and I screamed all the time and he just kept laughing and then he dragged me to the car and opened both doors and made me get on the inside. He was holding me all that time; he wouldn't turn my wrists aloose at all, and then he had intercourse with me. He just had intercourse once. Then he was mad. He said he was not satisfied. Said that I was terrible and all during that time I screamed and screamed and he said I wouldn't keep my mouth shut and he even put his hand over my mouth once. After he got up and on the way back he threatened two or three times to rape me again." The witness further testified that the defendant hesitated about taking her back home until she assured him that she was "not going to do anything about it," but that she "was afraid then that he would think he was going to be arrested and he was liable to have done anything." She arrived at home about a quarter of six in the morning and made a report to her mother, as a result of which "the police were notified right away and it did not take them but about seven minutes to get there." The foregoing narrative is based upon the testimony given by the prosecutrix on direct examination. The evidence given by her on cross-examination was not such as to require a finding that it destroyed the effect of her direct testimony; and it need not be stated.

The defendant was arrested during the same morning. According to the arresting officer, "He first said he was not out with a girl the previous night, but he later changed that when he was down at the police station. . . He denied that he was guilty of rape, but said that he had intercourse with her and she consented to it."

W. J. Needham, referred to in the testimony of the prosecutrix

as the "sheriff," or deputy sheriff, who operated the filling station, testified: "She asked me about Ralph taking her home and she was wanting to go home and then I told her I would speak to him about taking her home, and I did do so and he promised me he would."

The defendant stated to the jury that when the prosecutrix got into the automobile with him "she said she didn't have to be back home until seven or seven-thirty in the morning," and that she freely consented to all that was done, including the act of intercourse. He introduced several witnesses who testified that they were acquainted with her reputation for chastity and that it was bad. Several witnesses for the State testified that they were in like manner acquainted with her reputation and that it was good. Much other testimony was introduced, but the questions for decision do not require a further statement of the evidence.

The motion for new trial was based upon the usual general grounds, and several special grounds, assigning error on portions of the court's charge, omissions to charge, and rulings upon the admissibility of testimony. The grounds of the motion as amended will be more fully stated in the opinion.

■ In special ground 1 the movant assigned error upon a charge to the effect that if the sexual act was accomplished forcibly and against the will and consent of the female, it would be the duty of the jury to find the defendant guilty of the offense of rape, but if it was consummated by the defendant and the named female and "she consented to it, and her will yielded to it, and . . it was not forcibly," the defendant should be acquitted. This charge was assigned as error upon the following grounds: (1) it required the jury in order to acquit the defendant to find not only that the prosecutrix consented, but also that the act was not accompanied by force; and (2) the charge was erroneous and not sound as an abstract principle of law. In special ground 2 the movant assigned error upon the following charge: "The law does not require that the corroborative evidence shall in and of itself alone be sufficient to warrant a conviction or that the testimony of the female in question shall be corroborated in every material particular. Slight corroborating evidence that the defendant committed the crime of rape as is alleged in the indictment may be sufficient to authorize the jury to find the defendant guilty, as the sufficiency or weight of the evidence corroborating the testimony

of the female is a question alone for the jury to determine, as the jury must determine whether the testimony of the female has been corroborated; and if from all the evidence in the case, including the defendant's statement, whether or not you are satisfied beyond a reasonable doubt of the defendant's guilt of the crime of rape, as charged in the indictment." The exceptions were: (a) "Said instruction led the jury to believe" that the defendant's statement "in which he admitted having sexual intercourse with the female with her consent" was sufficient corroboration. (b) The charge was erroneous and not sound as an abstract principle of law. (c) It contained "an expression of opinion by the court that the crime of rape had been committed." (d) It contained "an expression of opinion that the testimony of the female had been corroborated, and that said instruction to the jury was confusing in that the court by making mention of slight corroboration in connection with the statement made by the accused, and by the use of the language contained in the above instruction, expressed an opinion to the effect that if the act of sexual intercourse had been entered into between the parties that the act of sexual intercourse itself was sufficient corroboration to convict the accused of the crime of rape."

In special ground 3 error was assigned upon the following charge: "Evidence of the character of the prosecutrix . . for lewdness when admitted may be considered by the jury in determining the truthfulness of her accusation of rape against the defendant, or if you believe that the act of sexual intercourse was in fact committed by the defendant with the prosecutrix whether it was forcibly against her will or was by her consent. The credibility of the prosecutrix is finally left to the jury under all the facts and circumstances of the case, and it is for the jury to say whether it will believe the testimony of the prosecutrix even though you may find from the evidence that she be not virtuous." The exceptions were: (a) This charge restricted the attack on the character of the prosecutrix for lewdness "to the question of veracity," and the court failed in this excerpt or elsewhere to charge the principle that evidence of such character for lewdness was admissible for the purpose of showing probability of consent. (b) The charge contained an expression of opinion by the court that the testimony of the prosecutrix alone showed that she did not consent to the

intercourse and that the crime of rape had been committed. It "directed the jury to place as much credence in the testimony of a lewd woman as a virtuous woman, and was tantamount to instructing the jury that a virtuous woman would consent as quickly and easily as a lewd woman."

In special ground 4 the movant complained of a charge to the effect that a female must have resisted with all her power and must have continued to do so as long as she was able, unless "her resistance was prevented by the violence of the defendant or was restrained by fear on her part created by the defendant." This charge was assigned as error upon the grounds that it was vague and indefinite, in that it did not instruct the jury as to what would constitute sufficient fear, nor that such fear must be reasonable, and the "said charge was erroneous and not sound as an abstract principle of law."

There was no merit in any of the foregoing exceptions. The charge on the evidence of reputation for unchastity did not limit the relevancy of such evidence to the question of veracity, as contended. On the contrary, it contained an instruction that if the jury believed the sexual act was committed, such character evidence might be considered in determining whether "it was forcibly against her will or was by her consent." Compare *Seals* v. *State*, 114 *Ga.* 518 (40 S. E. 731, 88 Am. St. R. 31) ; *Towns* v. *State*, 149 *Ga.* 613 (3) (101 S. E. 678) ; *Walker* v. *State*, 151 *Ga.* 341 (106 S. E. 547).

■ Special grounds 5 and 6 assigned error upon the failure of the judge, in his charge, to define the terms "threat" and "menace," definitions alleged to be correct being stated in these grounds respectively. There was no request to charge, and these grounds of the motion do not show error. *Pickens* v. *State*, 132 *Ga.* 46 (63 S. E. 783).

■ In special ground 7 it is contended that the court erred in allowing the prosecutrix to testify, "After he got up and on the way back he threatened two or three times to rape me again," over objection that this testimony amounted to a mere conclusion. Whether or not the criticism of this testimony be well taken, since the defendant had the right of cross-examination, with full opportunity to inquire into the facts, the admission of such testimony over the objection stated was not cause for a new trial.

In special ground 8 the movant assigned error upon the admis-

sion of testimony as to the general good character of the prosecutrix. In this ground of the motion it is merely recited that the defendant moved to exclude the testimony, and it does not appear what objection, if any, was made to its introduction. Accordingly, no error is shown. *Trussell* v. *State,* 181 *Ga.* 424 (2) (182 S. E. 514); *Whitener* v. *State,* 39 *Ga. App.* 676 (2) (148 S. E. 305).

■ In special ground 9 the movant assigned error upon the exclusion of evidence offered by him as to reputation for lewdness of the house where the prosecutrix resided. It appeared from other evidence that the prosecutrix was 18 years of age, unmarried, and lived in this house with her parents. In State *v.* Taylor, 57 S. C. 483 (35 S. E. 729, 76 Am. St. Rep. 575), it was said: "There was no error in excluding the testimony of defendant's witness, . . as to the reputation of the house in which the prosecutrix lived prior to the alleged rape. The prosecutrix was between fifteen and sixteen years old at the time of the alleged rape, and lived in the house with her grandmother, mother, and sisters and brother. While the reputation for chastity of the prosecutrix was a legitimate subject of inquiry, as bearing on the issue whether she consented to the act, it is too far removed to extend the inquiry to the reputation of the house in which she lived with others." See also 52 C. J. 1084, § 116; 22 R. C. L. 1209, § 42. While there may be some exceptions to the rule stated, the assignment of error does not show ground for an exception. The court did not err in excluding the evidence.

■ On conclusion of a colloquy between the court and counsel as to the admissibility of evidence as to the character of the female for unchastity, the judge addressed himself to the jury as follows: "Gentlemen, that is only for the purpose of your determining under all the evidence in this case including this particular evidence with regard to attacks upon her character whether or not this act of intercourse was done forcibly and against her will, because no matter how lewd a woman might be, no one would have the right to force her against her will. You could rape a prostitute as well as you could a virgin." In special ground 10 of the motion for a new trial the movant assigned error upon this statement as follows: (a) "The above instruction to the jury was an expression of opinion by the court that force had been used," for that in the use of the words, "no matter how lewd a woman might be, no one would

have the right to force her against her will," the court intimated that force was used on the prosecutrix by movant. (b) In using the words, "You could rape a prostitute as well as you could a virgin," the court further intimated and expressed "an opinion that force was used in the instant case, the evidence being that the prosecutrix was lewd, and the court in reiterating and reannouncing to the jury, before his charge, this language, to wit: 'Gentlemen, that is only for the purpose of your determining under all the evidence in this case, including this particular evidence with regard to attacks upon her character, whether or not this act of intercourse was done forcibly and against her will, because no matter how lewd a woman might be, no one would have the right to force her against her will,'—expressed an opinion that force was used in the consummation of the alleged crime." (c) "The above instruction deprived the movant of the principle of law that evidence of the character of the prosecutrix has a bearing on the question of her consent."

The court, in the same connection, and referring again to the evidence of reputation for unchastity, made to the jury the following statement: "It goes to the credibility, gentlemen. That is what the jury passes on, the credibility of witnesses that are attacked. You are the sole judges of the credibility of the witnesses and all the facts in the case." In special ground 11 this statement was assigned as error upon the ground that it restricted consideration of such evidence to the question of credibility and deprived the defendant of his right to have the evidence considered by the jury on probability of consent.

There is no merit in any of the foregoing exceptions. The instruction complained of in special ground 10 did not, as contended, intimate any opinion by the court that force had been used, nor did the instruction complained of either in this ground or in ground 11 limit consideration of the evidence to the question of credibility or deprive the defendant of the principle that such evidence could be considered by the jury on the question of consent.

Each of the foregoing statements by the judge was made before the evidence had been concluded, and consequently they were not contained in the general charge to the jury. Whether or not the defendant should have made objection thereto at the time, neither of them was actually subject to the criticism made. Furthermore,

the judge in his general charge instructed the jury that such character evidence might be considered by them in determining whether if the sexual act was committed by the defendant on the prosecutrix, it was done "forcibly against her will or was by her consent." In this connection, attention is again called to the decision in *Walker* v. *State,* supra, and see also *Black* v. *State,* 119 *Ga.* 746 (5) (47 S. E. 370). If the defendant had desired more explicit instructions as to the purposes for which such evidence might be considered, he should have presented a proper and timely request therefor.

■ "Force is an element of the crime of rape, but it may be exerted not only by physical violence but also by threats of serious bodily harm which overpower the female and cause her to yield against her will." *Vanderford* v. *State,* 126 *Ga.* 753 (5) (55 S. E. 1025). The evidence authorized the verdict. The court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*